Case number 24-7047. Mady Marie-Louise Schubarth v. BVVG Bodenverwertungs- Und-Verwaltungs GMBH Imbalance. Mr. Dirks for the imbalance, Ms. Bowman for the appellee. Morning, counsel. Mr. Dirks, please proceed when you're ready. Good morning. May I please start? My name is Walter Dirks. I'm counsel for BVVG. But first of all, I want to point out again that today is the day that oral argument of the Supreme Court is occurring in the Simon v. Hungry case, which we flagged in a reply brief, because it goes to the issue of, you know, the burden going forward and ultimate burden of proof, which the obviously is pretty key when you consider the way that the plaintiff has reframed the issue as they see it. They've put the burdens front and center of their argument. That's currently before the Supreme Court. The Supreme Court is, by the way, the Solicitor General, by the way, is arguing that the plaintiff bears the ultimate burden also, and the arguments they give in favor of that are that the avoiding of damaging foreign relations, which was cited in Helmerich, and also, quite frankly, reciprocal self-interest. We don't want other countries to do this to us. And it's worth pointing out that the Supreme Court has noted that no other country has an expropriation exception except us. You have foreign sovereign immunity. So we're sort of an outlier. So that suggests caution with regard to the exercise of jurisdiction of the expropriation section. Moving on to the substance of the case here, Clark, Supreme Court case, which we cited and relied on heavily, which the district court was very dismissive of. But in Clark, the Supreme Court was dealing with a matter of foreign relations, i.e., a treaty between Germany and the United States, said the Allied Control Council has assumed control of Germany's foreign policy and treaty obligations. And from that, Schubert says, well, it's only, and Judge Cooper agreed, well, that's just only foreign relations, it's nothing else. But the document that was cited by the Supreme Court was much broader. It said, the Allied representatives will exercise such control as they deem necessary over or any aspect of German finance, agriculture, etc., etc., internal and external and overall related and ancillary matters, pretty broad. Also on the June 5, 45, the declaration of the four powers asserted that the four powers hereby assume supreme authority with respect to Germany, including all powers possessed by the German government, the high command in any state, municipal or local government authority. So basically, they're saying that we're acting as Germany. Now, at one point in their brief, Schubert's counsel argues that we're really saying that it was a continuation of Nazi Germany, which obviously it's not because the one thing that all these cases and everything make it very clear is that the existence of a nation state is independent of the government that happens to be in control of it at a particular time. It could be a kingdom, it could be a republic, it could be a dictatorship. Doesn't that do away with, for example, in Simon, we had greater Hungary, which had annexed parts of, I think, Czechoslovakia and Austria, and the nationals of the annexed areas were viewed as, takings from them were viewed as not barred by the domestic takings bar, whereas Hungary's taking from Hungarians were. So I guess the question is, it can't be that the government doesn't matter and that if there's a foreign government occupying your territory, it doesn't vitiate the state qua state. And I understand that the Allies were, in a sense, provisional government, but how can it be that if, let's say, the Allies came in and they expropriated all the factories and all the patents and all the copyrights to enrich their own home countries, surely that would implicate international law. It has to be the international law of expropriation. That would implicate the international law of expropriation if they expropriated all the productive factories and the patents and the copyrights to make goods that they deemed to be the Allies' own, rather than that they were managing for the benefit of the German people. This gets off into the Hague Convention by definition. And I think the Hague Convention, once again, we have a situation where before Judge Cooper we had, I went and counted, it's a grand total of 11 lines in Schubert's brief discussing the Hague Convention. The Hague Convention is now front and center in their brief here. The Hague Convention is outside the scope of the second restatement. And in fact, with regard to the second restatement and implications with the Hague Convention, you have a brand new appeal in the DeCepel case. You may recall the DeCepel case, which has been here several times. Well, it, like this case, is coming back. It's now your case 24-7148. And in that case, the issue is directly having to deal with the interplay, if any, between the Hague Convention and your ability to bring a case in the United States for a violation of the Hague Convention. Maybe you're getting to the answer, but I'd just like to hear your response to the hypothetical Judge Pillar posed, which is... I think the hypothetical she's suggesting is one where the Hague Convention probably would apply, because you're talking about a military occupation during or immediately after a war. And I think that you're probably into the Hague Convention, and I think that it's very clear, first of all, there's no private right of action under the Hague Convention. And second of all, it's clear that that's outside the scope of the second restatement, and therefore, based on Phillips, outside of the scope of the expropriation exception, which is built into the FISA back in 1976. But... So the answer would be that if an occupying power takes the intellectual property for its own use, there's no... that that would not fall within the expropriation exception, in your view? Correct. It would not fall within, also, if it's a violation... Because it's a domestic taking? The... Well, there are two ways to look at this. The one is that as the plaintiff is arguing, the Hague Convention is really the violation here. The problem with that, as we point out, is that that is not the law of expropriation. It also is specifically excluded from the scope of the the Hague Convention. So you're out of luck in the United... You can't get jurisdiction in the United States. That's one box. The other box is, okay, let's say the Hague Convention doesn't apply. At this point, what you have is the contemporaneous documents from 1945 make it very clear that the foreign powers assumed the entire role of the German government. So... They were in. Right. So you've noted that the Soviet Union was acting as the government of Germany. Correct. When it propounded the Thuringian Land Reform Act into law. But can't it be both? I mean, isn't that the nature of even a peaceful occupation, that it is both fully the government of Germany and itself? It has another government identity, which is, you know, the Allied powers each had their own, and I think it's fair to say, primary identity as the governments of states that were foreign to Germany. And so why doesn't that vitiate the domestic takings exception, render it inapplicable here? I think you've run into a theoretical problem here, because the Supreme Court and Clark made it very clear that the Allies were, with regard to foreign affairs, were acting as Germany. Right. No ands, ifs, buts, or ors. There wasn't an asterisk up there somewhere. The information that they're assigning to, the information from 1945 makes it very clear that the Allies weren't saying, oh, we have a box over here that's foreign relations, and we have a box over here, which is everything else. They assumed the totality of the authority of the German nation. But they didn't relinquish their other governmental hat, which was foreign. Well, then I think, I don't know how you square that with Clark. And I think that you're talking about the contemporaneous statements of the four powers of 1945. And here we are, almost 80 years later, saying, well, we're going to quibble with that. They weren't exactly right. We're going to second guess what the four powers did in 1945. One of the four powers being our government, the United States government. And I think that that's a, that's pretty profound. I don't think that second guessing the contemporaneous actions in 1945, particularly when it's very clear what was going on. And the other thing that's very clear is, you know, later on in 1947, the record we submitted is the United States and the United Kingdom also had a land reform program where property was expropriated. So I think that getting back to the assertion that the State Department always has that this area here is very dangerous, because it has unintended consequences all over the place. And the second guessing what the United States and four, it's one of the four governments did in 1945. And their pronouncements that we are acting as Germany, we have assumed the entire authority of the German nation and its political subdivisions. And what the argument is, well, we're going to over, we're going to, we're going to second guess all that. And I think that that could have sort of strange consequences. And one of the things that that dawned on me just reading this morning was, we have a case that basically says the Soviet Union violated international law in 1945. The Russian Federation is the legal successor to the Soviet Union. I think to this moment, they're blissfully unaware that that is a ruling of the United States District Judge and the consequences that could have down the road, because apparently there are 20,000 properties that were in a situation similar to Mr. Schubert's parents, just in the Soviet sector. There are an unknown number, at least at this point, of properties with a similar issue in the zone that was controlled by the United Kingdom, and also in the zone controlled by the United States, because, as we know, there were land reform efforts in 1947, which were not all that dissimilar than what the Soviet Union's sector did in 1945. You think the reason that the Russian Federation is unaware of it is because they think that the Soviet Union was acting as Germany in 1945? I think they're blissfully unaware of the case, period. That could be the case all over the place. There could still be international law violations. That's true, but the thing is, an American court is issuing a decision saying that a third-party nation is violating international law, which could have some theoretical implications down the road. But you're right to say theoretical. They weren't a party to the case. Right, and you didn't challenge Judge Cooper's holding that BVVG, as the successor to whatever value was allegedly expropriated by the Soviet Union, would be the appropriate defendant. Well, actually, we talked about whether there was jurisdiction over BVVG. Right, but there was a holding that BVVG would be responsible now for the taking. In other words, I mean, you're pointing to the argument that why are they suing Germany? They should be suing Soviet Union or Russia, but that was resolved, and I don't take that to be before us. No, I don't think that's what my point is. My point is that the implications go way beyond the four corners of this case. I understand. So you're saying it's a claim, it's a geopolitical statement of potential importance. It gets right back to what the Solicitor General is articulating for the, I don't know, umpteenth time at the Supreme Court about the other reciprocal relations, and also just making things unpleasant between countries. That's all I really wanted to go over. I think the briefs on both sides have been pretty thorough. I'm not sure I got a response to my question about it could be both, that the allies were both fully the only domestic government that Germany had at the time, but they also were still themselves. For example, in your opening brief at page 15, you say that the expropriations were deliberately made possible by acts of the Soviet occupying power. They were substantially based on Soviet occupying power's decisions. Why isn't that reason enough to conclude that the expropriation was an act attributable to a foreign sovereign under the second restatement? I don't think you can do that consistent, unless you want to basically say the four power declarations in 1945 were wrong. No, I'm explicitly saying they were the only governments that Germany had. So I'm accepting your premise. They were the government. Germany had no other. In fact, the project of the allies during this transitional period was to eliminate the vestiges of their most immediate prior government, which was the Nazi government, demilitarize, make sure they had no control of communications, and on and on. So they were the government, the domestic government, but they were also governments of foreign nation states now. And is that enough? And as you also said in your reply brief, the Soviet Union was involved in triggering the Thuringia Land Reform Act into law. Okay, but you're sort of saying you have the Schrodinger's cat equivalent over into international relations. You know, it is, but it isn't depends on exactly what instant you're talking about. I think once again, that's a stretch, put it mildly. I think that I would argue that if you go back to what the thought was of the four powers in 1945, which I think the Supreme Court has suggested is almost as close to authoritative as you can get, they were acting as the German government. They didn't say, except over here, we're doing it on our own. So is your argument, yes, they wore two hats, but the hat they wore when they were involved in carrying out the land reform was the domestic hat. It was the German hat they were wearing. That's what I mean, domestic to Germany. Correct. And I think that is, I think the most fair reading of the contemporaneous documents from 1945. And if you start drifting off that, once again, you've got the problem is you've got history, it's almost 80 years ago. And it gets harder and harder to sort of try to parse these things that finally, even if you wanted to go down that road. And again, I think you're in an area of international relations, the four powers were very clear in 1945 of what they considered themselves to be doing. Colleagues, I have additional questions. At this point, we'll give you a little time for rebuttal. Okay, thank you very much. Ms. Bowman. Ms. Bowman, did the country of Germany ever disappear? I'm sorry, Your Honor, can you repeat your question? Did the country of Germany ever disappear in the 1940s? It did not, Your Honor. May it please the court, Your Honors, my name is Teresa Bowman. I'm here on behalf of Appellee Mrs. Schubert, an American citizen and heir to over two square miles of very valuable farmland that was taken by the Soviet Union in 1945. Judge Cooper correctly determined below that the district court had jurisdiction over this case under the expropriation exception, rejected the BVBG's argument that now the only issue on appeal that the Soviet Union was acting under color of the German government and not on its own authority as an occupying sovereign. Can I ask you if the Supreme Court in the case it's hearing today includes that the plaintiff bears the burden, unlike the defendant bearing the burden under our decisions, how does that affect? It doesn't affect. Given the way that the pleadings have been constructed and the focus on Germany and et cetera. It does not affect this case at all, and that's because my opponent has not identified any actual factual dispute to which a change in the rule on burden shifting would actually make a difference here. The parties evidently agree on the same universe of facts. They disagree on the legal significance of those facts. My opponent agrees that the Soviet Union was in charge. We agree that the Soviet Union was in charge. The my opponent agrees that the Soviet Union directed the Land Reform Act and directed the actual expropriation of this property. We agree that that's what happened. The place where we disagree is that my opponent draws from the record the conclusion that the Soviet Union was the German government, was acting under color of the German government, and we disagree. We believe the record clearly shows the opposite. I'd like to highlight, for your honors, a few statements within the two documents, the two declarations that set forth the framework under which the Allied representatives came in and controlled the functioning of the German occupied territory. The June 5th declaration, which is in the addendum to my opponent's brief, includes the statement that the Allied representatives in carrying out the administration of the occupation were, and I'm quoting, acting by the authority of their respective governments. That's the opposite of my opponent's argument. The idea that the Soviet Union was wearing the hat of the German government also doesn't find any support in the record. The June 5th declaration again says, and I'm summarizing here, but it's Article 13, the Allied representatives will issue instructions and the German authorities will follow unconditionally those instructions. And so I think my opponent's characterization of the mechanisms by which the expropriation was carried out somehow compelled the conclusion that it was the German government acting independently of the Soviet Union occupying authorities. What about the argument that the Allies had two roles, or as I put it, wore two hats, and the hat that they were wearing here was really a domestic hat? I think it would have surprised a lot of people if you had said at the time that the Allies were engaging in expropriation in violation of international law. They viewed what they were doing as acting in lieu of the defunct German government and the interests of the German people to stabilize the German economy, to make sure that people who were migrating en masse and who were starving would have the means to survive. And one of the things they did in that regard was to break up large property holdings to try to get more people to where they were and allow them some form of sustenance. So if that's what was going on, if it was viewed as the Allies wearing their hat as government agents doing an expropriation in the interests of the German people, they took nothing home with them. Why isn't that a claim that is barred under the Foreign Sovereign Immunities Act by the domestic takings exception? A few. Thank you, Your Honor. I have a few responses to that. One is, I think, the better view, the view that's supported both by the Hague Convention and by the few courts that have addressed this question head on, and we cite to the Second Circuit's decision in the state of the Netherlands case, is that it's not a matter of the occupying sovereign wearing two hats. The occupying sovereign. And the Berlin Declaration and the September 20, 1945 arrangements for control document both reflect that there is an occupying authority and there are also German authorities. And the setup is that the occupying authority is in charge, it dictates to the German authorities, but the German authorities are there to carry out the instructions of the Soviet occupying power. So, I think the better view, Your Honor, is not that the Soviet Union is wearing the German hat any more than the German authorities would be wearing the Soviet Union hat. It's that, and this is also what the Hague Convention says, when you have an occupying power come into a territory, the existing government, as Judge Henderson just asked me, the existing state government, it doesn't disappear. The state government did disappear. It's the state, I believe she asked about. You're correct. But I think in this case, my point, Your Honor, is that there was a municipal machine on the ground of existing German authorities who were there to carry out instructions of the Soviet government. And so, it really doesn't make sense to say, well, the Soviet Union came in and acted as the German government. They came in as the occupying sovereign and dictated to the German authorities on the ground to carry out their dictates. So, you don't see a difference between a belligerent occupation and a, I mean, and that it was done in the perceived interest of the German state and the German people. What, do you dispute that? Well, I also, Your Honor, made a comment maybe a minute ago about, you know, the occupying powers may have been surprised to learn that they were violating international law. They shouldn't have been surprised because the Hague Convention, which, you know, 1907 Hague Convention, which preceded this occupation and sets forth the international law regarding a belligerent occupation includes the instruction that private property shall not be confiscated. So, if they were surprised that the confiscation of private property would be viewed a year later or a hundred years later as a violation of international law, they shouldn't be. But what about ratification? I mean, there was a seamless progression into East Germany being its own German sovereign state with the, you know, after the allies, including the Soviet Union, withdrew. And even when there was unification in Germany, both parts of the German state agreed that they weren't going to unravel any of the expropriations affected during the land reform period at issue here. I think Your Honor is touching on a very important point. The reason why they determined they couldn't do that was because the German government, both as part of reunification, as part of the joint 1990 declaration where they set out exactly this issue, and also, you know, we point out the multiple decisions of the Thuringia State Agency that say the same thing. But the reason they treated the 1945 to 1949 expropriations differently is because the German government has repeatedly determined that those land expropriations and Mrs. Schubert's specific expropriation were carried out as an exercise of occupation authority, occupation sovereignty. But why are they not ratified and rendered domestic as of the time when the East German government is in place, and then again, as of the reunification? I think if they're accepting it as domestic, and they're not saying, oh, this is problematic, we have to undo this. That is clearly the German government vis-a-vis the German people. I think the, my reading of that, Your Honor, is that the German government is coming to the conclusion that it is not a domestic act for them to unravel in the first place. It's an act of a foreign sovereign power. What would happen if they're, when the occupying power administers the system of justice, right, because there's no replacement system, and so they're, you know, dealing with crimes. Is that when a citizen is detained by the occupying power in connection with enforcing law in that zone, is that, and does that state a violation of international law because the citizen that's being detained by a different state? Your Honor's question is whether, under whose authority, I'm sorry, I don't understand Your Honor's question. Yeah, so an occupying power, they kind of restore order in an area, and they're responsible for creating conditions under which, you know, the country can flourish again in the future, and part of that is enforcing the criminal law and just having a system of justice, and I'm wondering if a citizen is detained in the enforcement of law, are they being detained by another state so that then they have an international law claim regarding whatever conditions of confinement, all those kinds of things that can, I assume, can state an international law claim if you're being detained by a foreign power. I think I understand Your Honor's question, thank you, and I think, well, the very lawyerly answer of it depends, and what depends upon is what criminal justice mechanism and what instructions had been set out by the occupying power. If the occupying power had dictated what the occupation criminal justice system had been, and the detainment of the citizen happened as part of that setup, then I think it would be viewed properly as a detention by the foreign sovereign, in your hypothetical. If, on the other hand, the local German authorities on the ground had contravened whatever criminal justice mechanism had set up by the occupying power, it would probably be more likely viewed as a domestic detention. I'm speaking broadly, but I think that is a fair way to answer your hypothetical. Have there been, to your knowledge, any cases in which German nationals successfully challenged actions of any of the Allied powers during the occupation period as violations of international law? Have there been any cases in which a German national successfully challenged actions of any of the Allied powers during the occupation period as violations of international law? Reinforcing your premise that these are acting as foreign occupying powers as opposed to... I don't think there's a case, Your Honor, where a court has been presented with this question that an occupying power that expropriates property on the authority of its own government is instead affecting a domestic taking. So I don't think there's a case on either side of that question. I don't believe a sovereign has made quite this argument before that a foreign sovereign expropriation is instead a domestic taking because anything the foreign sovereign occupier does is, in fact, a domestic act of the German government. The use of the term aliens in... Like, were the Allies, when they were in control of Germany from 1945 to 1949, were all the German people thereby rendered aliens in that territory? When we look at the restatement of what constitutes a taking in violation of international law, it talks about a nation-state taking the property of aliens. They were, vis-a-vis the Soviet Union, they were foreign nationals. However, Your Honor, we are not relying on the restatement to articulate a violation of customary international law as I know, for example, the plaintiffs did in the 2023 decision in Simon. We have identified a very important express international convention that includes a very clear, concrete, you shall not expropriate private property from this group of people under these circumstances. Make sure my colleagues don't have additional questions for me. Thank you, Ms. Feldman. Thank you, Your Honor. I'm sorry, I did have a question of what's your response to... It's really a practical question, but Mr. Derrick's pointing out that there are many tens of thousands of people in the same position as your client. And if this is a taking in violation of international law that opens the door to a Foreign Sovereign Communities Act claim, should we expect to see hundreds and hundreds of claims? No, Your Honor, because this... I'd like to answer Your Honor's question. I'd like to zoom out a little bit and point the court to back to our complaint and the causes of action that we were actually alleging here. Mrs. Shoebarth was... This is not a case about whether or not Mrs. Shoebarth has a right to compensation for this property. This is a case about quantum. We've alleged a claim under the FCN Treaty between the United States and Germany, Mrs. Shoebarth is an American citizen that says she's entitled to full market value compensation for her property. The Compensation Act... And by the way, that treaty we've alleged is a component of German law, and under German law, that treaty provides a private right of action. That's what we've alleged in the complaint. That could be brought in Germany, that's a treaty and that's German domestic law. Your Honor's question was... Well, Your Honor's question was... I'm sorry, Your Honor's question was, can we expect to see a number of claims? The Thuringia State Agency did offer nominal compensation to Mrs. Shoebarth. The German government has acknowledged that she has a right to some compensation over her property. We're in an American court because we're alleging that as an American citizen, she has a right to full compensation under a U.S.-German treaty. So is this going to open the door and implicate claims by anyone who feels that they were offended by an act of an allied power? No, this is already... And this property was taken during this period in a manner parallel to the taking of Mrs. Shoebarth's mother's property. Mrs. Shoebarth is already a part, a narrowed group of persons that has been found eligible to seek compensation for her property. You know how many when you say narrowed? I don't, Your Honor. But I know, I take Your Honor's point of if this, would this open the door to a universe of claims? And my point is that we're not, we are speaking about a plaintiff who is eligible to receive compensation under Germany's Compensation Act. The issue is how much and whether or not the FCN treaty requires a different level of compensation than the Thuringia State Agency has determined. Colleagues, do you have any additional questions? Thank you. Thank you, Your Honors. I'd just conclude by stating that Judge Cooper's decision below was well-reasoned and correct, and I urge the Court to affirm. Thank you. Dirks, we'll give you two minutes for a rebuttal. Okay, I'm going to bounce around here. I apologize. First of all, the counterstatement of the issue, whether the District Court correctly concluded that BDDG failed to meet its burden, their whole analysis is based on the burden that the D.C. Circuit cases apply, which is exactly the issue in the case currently at the Supreme Court. Is it opening the door to a lot of other complaints? You betcha it is. You not only have the 20,000 properties in the Soviet sector, you have properties in the U.K. sector, and you have properties in the American sector. Judge Pillar, you made a very good point. The property here was not hauled off and taken back to the Soviet Union. It's still there. It benefited the German nation. It's just that simple. Another case for an occupying power, the D.C. case is going to deal with, is part and parcel of that, because it dealt with the expropriation of property by allegedly Germans during wartime in Hungary. And the question is, what do you do about that? And I think that, you know, I don't want to get into it because it's obviously a separate case, but it is exactly on point with some of what you're talking about. I think Clark is the overriding thing here. Clark adopted and accepted the Allies' pronouncements from 1945. They didn't parse it out and say, well, we're only talking about foreign relations. The thing they were citing was sort of, you know, global. And, you know, I think that you just got to go back to that. And I don't think there's a way you can parse that in a way that you could apply down the road without having it take you to places you probably don't want to go. And again, the Hague Convention is implicated in what you're hearing here. And again, that is key to the D.C. case, which you are going to be hearing later on when it finally gets to you. It also was directly on point in the Prince case from 1994 that was written by then Judge Ginsburg, which he said that, you know, you may have a complaint, but you can't bring it here. There's no jurisdiction. I think that's our point. There's no jurisdiction because of the unique statute that we're looking at. And that's really what it boils down to. I'm going to sit down before I get in trouble. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Henderson; Pillard